## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

NAYLOR FARMS, INC., ET AL.,     )
     )
         Plaintiffs,     )
vs.     )     NO. CIV-11-0634-HE
     )
CHAPARRAL ENERGY, LLC,     )
     )
         Defendant.     )

## ORDER

Plaintiffs Naylor Farms, Inc. and Harrell's L.L.C. (collectively "Naylor Farms") filed this putative class action on behalf of themselves and other Oklahoma royalty owners, seeking to recover for the alleged underpayment of royalties by defendant Chaparral Energy, LLC ("Chaparral"). The action is similar to several other lawsuits filed by royalty owners claiming that well operators (or non-operators which marketed the gas) have underpaid royalties in violation of Oklahoma law by improperly deducting certain costs incurred in making the gas marketable. After plaintiffs filed a motion seeking to have the class certified under Fed.R.Civ.P. 23(b)(3) and a motion for partial summary judgment, Chaparral sought relief under Chapter 11 of the United States Bankruptcy Code. The case was stayed, but the bankruptcy court has lifted the automatic stay with respect to plaintiffs' class certification motion. Having considered the parties' submissions, the court concludes that, with a modification to the class definition and the exclusion of plaintiffs' fraud claims, the motion for class certification should be granted.

<u>Background</u>[1]

Chaparral operates approximately 2,500 oil and gas wells in the State of Oklahoma. Naylor Farms has a royalty interest in one Chaparral-operated well and Harrell's has royalty interests in two wells defendant operates. The proposed class includes more than 10,000 royalty owners who have approximately 6,515 leases covering 1889 wells.

Lessees have an implied duty of marketability ("IDM") under Oklahoma law. <u>Chieftain Royalty Co. v. XTO Energy, Inc.</u>, 528 Fed. Appx. 938, 940 (10th Cir. 2013). "Absent lease language negating the IDM or permitting certain deductions, the lessee must bear the full cost of services undertaken to place gas in marketable condition, such as gathering, compression, dehydration, treatment, and processing ('GCDTP' services). <u>Id.</u>, citing <u>Mittelstaedt v. Santa Fe Minerals, Inc.</u>, 954 P.2d 1203, 1208 (Okla.1998). Plaintiffs claim that of the 6,515 potential class leases, only 1238 "specifically allowed deductions." Doc. #150, p. 2. That leaves, they maintain, "5,277 Class Leases that do not negate the implied duty to market." <u>Id</u>. Plaintiffs allege that "[t]he gas from the Class Wells must undergo at least one of the GCDTP services to become marketable," Doc. #134, p. 18, and that they were improperly charged for those services by defendant's use of percentage-of-proceeds ("POP") contracts or variations of it. It is undisputed that Chaparral sells between 85 and 90% of its gas at the wellhead, with the remainder being sold at the tailgate of a processing plant. Doc. #145, p. 16. It also is undisputed that Chaparral sells most gas "under

_____

[1]*Page references to briefs and exhibits are to the CM/ECF document and page number.*

percentage of proceeds ("POP") contracts."[2] *Id.* According to plaintiffs, pursuant to the POP contracts, Chaparral sells the raw gas, at the "wellhead," to midstream processing companies in exchange for a percentage of the sales proceeds the midstream companies[3] receive after they have put the gas in marketable form and sold it in the interstate market. Because the royalty Chaparral pays them is based upon the wellhead sales price or "net" price it obtains, rather than the "gross" sales price the midstream company receives for the gas, plaintiffs claim deductions have improperly been made from their royalty payments. Chaparral contends it "is paid, based on 100% of the value, calculated at the wellhead." Doc. #145, p. 16, ¶18. According to Chaparral, the wellhead is the "first market" or a "primary market" for gas in the state. Central to plaintiffs' argument is their assertion that raw gas at the wellhead is not a marketable product.

It is undisputed that Chaparral rapidly expanded its business by acquiring producing wells. Because of that rapid growth, plaintiffs allege Chaparral lacked the time or personnel to analyze the well leases and determine which negated the IDM. Rather than relying on the lease language to compute the royalty that was owed, plaintiffs contend Chaparral simply

---

[2]*The remainder of Chaparral's gas contracts for the Class Wells are percentage of liquid (POL) contracts, which are "[v]ery similar to a POP contract." Doc. Nos.134-7, p. 7; Doc #134, p. 17 n.13. Under a POL, Chaparral sells liquids at the wellhead to a midstream company. The residue gas, once it is processed, is returned to Chaparral at the tailgate of the processing plant and then sold. Doc. Nos. #134, p. 14 n.10; 145, p. 16, ¶19.*

[3]*Plaintiffs do not contend that there is a relationship between Chaparral and the midstream companies or challenge its assertion that its gas contracts are arm's length, third party sales.*

adopted its predecessors' methods of payment, their "pay decks" or "pay histories."[4]

Plaintiffs claim Chaparral systematically underpaid royalties by improperly deducting costs incurred to place the gas in marketable condition. Plaintiffs also claim that, unless it is instructed to the contrary, Chaparral's default position is to charge royalty owners for the costs involved in processing gas into "marketable condition." Plaintiffs assert claims for breach of contract, breach of fiduciary duty, actual and constructive fraud, and unjust enrichment. They also seek an accounting. Plaintiffs seek to represent the following class in this lawsuit:

> All non-governmental royalty owners who own or owned mineral interests covering wells operated by Chaparral Energy, LLC ("Chaparral") in the State of Oklahoma, or in which Chaparral markets production, that produced natural gas and/or natural gas constituents or components, such as residue gas, natural gas liquids (or heavier liquefiable hydrocarbons), gas condensate or distillate, or casinghead gas and which is or was subject to a marketing arrangement identified as a percentage of proceeds, percentage of index and/or percentage of liquids arrangement who are further divided into the following subclasses: Subclass 1: All class members who have or had a direct lessor-lessee relationship with Chaparral;
>> Subclass 1(a): where Chaparral is or was the Operator of the wells;
>> Subclass 1(b): where Chaparral, as non-operator of wells, separately marketed gas;
>> Subclass 2: All class members who do not or did not have a direct lessor-lessee relationship with Chaparral;
>> Subclass 2(a): where Chaparral is or was the Operator of the wells;
>> Subclass 2(b): where Chaparral, as non-operator of wells, separately marketed gas.

---

[4] *Plaintiffs make the assertion that Chaparral "ignores the lease language in calculating and paying royalty" and instead "pays all Royalty Owners based upon the amount it receives from the midstream company." Doc. #134, p. 16. However, it also contends that Chaparral simply adopted its predecessors' pay decks or pay histories. Id. Without a showing that Chaparral's predecessors paid all royalty owners in the same fashion, plaintiffs have not demonstrated a uniform payment methodology.*

Doc. #134-40.[5]

Analysis

"'The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213, 1217 (10th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011)). Rule 23 sets out the requirements for class certification. "Rule 23(a) requires the party seeking certification to demonstrate that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there is a question of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy)." Id. The class also must satisfy one of the three requirements listed in Rule 23(b). Id. In this case, the plaintiffs rely on Rule 23 (b)(3), which requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

Rule 23 sets forth more than a pleading standard. Wal-Mart, 564 U.S. at 350. "A party seeking class certification must affirmatively demonstrate his compliance with the

---

[5]*Plaintiffs did not provide any dates limiting the claims of the proposed class in either the complaint, amended complaint or class definition. As defendant did not challenge the lack of a date restriction, it was an obvious oversight, which nonetheless must be corrected for the class to be certified.*

Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* The court "has an independent obligation to conduct a 'rigorous analysis' before concluding that Rule 23's requirements have been satisfied." Roderick, 725 F.3d at 1217 (quoting Wal-Mart ,564 U.S. at 351). "Granting or denying class certification is a highly fact-intensive matter of practicality." Monreal v. Potter, 367 F.3d 1224, 1238 (10th Cir. 2004). Applying these standards, the court concludes the proposed class, with some modifications, should be certified.

Rule 23(a)

Numerosity

Numerosity requires the plaintiff to show that the "class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a). This element is clearly met and not contested by Chaparral.

Commonality

To satisfy the element of commonality, the plaintiff need only demonstrate that there is a single question of law or fact common to the entire class. Wal-Mart, 564 U.S. at 359. But "the mere raising of a common question does not automatically satisfy Rule 23(a)'s commonality requirement." Roderick, 752 F.3d at 1218. "Rather, the common contention 'must be of such a nature that it is capable of *classwide resolution* — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* ( quoting Wal-Mart, 564 U.S. at 350).

While plaintiffs list multiple common questions in their brief and additional questions

in their supplement which they assert satisfy Rule 23(a)'s commonality requirement,[6] they focus on one – whether all class leases contain the IDM. In doing so, they address what the Tenth Circuit in <u>Roderick</u> and <u>Chieftain</u> recognizes can be a principal obstacle to class certification in this type of case – "lease language variations [which] destroy the possibility of resolving the common question on a *classwide* basis." <u>Chieftain</u> 528 Fed. Appx. at 942.

To meet the concern identified by Tenth Circuit, plaintiffs followed the court's suggestion in <u>Roderick</u> and "create[d] a chart classifying lease types." <u>Roderick</u>, 725 F.3d at 1219. Doc. # 134-2. Chaparral's leases were reviewed and categorized by royalty clause language.[7] Doc. Nos. 134-37; 134-2 (Royalty Analysis); 134-3 (Royalty Clause Type Key).[8] Plaintiffs claim their analysis established that not one of the Class Leases contains express language negating the IDM. They also assert that "90% of lease types within the Class Definition were previously ruled upon by another Judge in this District and/or the Oklahoma Supreme Court and found not to negate the IDM." Doc. #134, p. 24 n.20. Plaintiffs contend the proposed class can readily be certified because "regardless of lease language variations,

---

[6]*See Doc. #134, pp. 22-23.*

[7]*Plaintiffs assigned the Clauses numbers. The court will refer to them by their numbers, e.g., "Clause __."*

[8]*Once the leases were categorized by royalty clause language, they were designated as Standard Proceeds ("SP"), Disallowed ("DA"), or Allowed ("AL") leases. Doc. #134-37, p. 3, ¶9. According to plaintiffs, the SP category contains the bulk of the leases (5,065), which do not allow any deductions from the royalty owner's share. Id. at ¶10. They claim the DA category "actually add[s] to the IDM with words specifically prohibiting Chaparral from making deductions from the royalty owner's share for one or more of the specific midstream services." Id. at pp. 3-4, ¶11. Plaintiffs contend there are 1,238 leases in the remaining AL category, which negate the IDM. Id. at p. 4, ¶12.*

the legal effect of each Class Lease is the same – they all contain the IDM." Doc. #134. p. 24.

Defendant responds that, "even if Plaintiffs were correct (and they are not) that these terms all mean the same thing, no Oklahoma court has interpreted their meanings when used along with other terms in multi-prong royalty provisions, or when the lease uses one price in the text and another price in an exhibit or attachment." Doc. #145, p. 13, ¶8(b). Defendant also argues that a finding of commonality is precluded because raw gas is marketable at the wellhead and that determining which gas must be processed requires a well by well determination.

The named plaintiffs' leases include two royalty provisions or prongs. For gas "produced from any oil well" the royalty is "one-eighth (1/8) of the gross proceeds, at the mouth of the well, received by lessee for the gas during the time such gas shall be used."[9] Doc. No. 145, p. 7, ¶2. For gas produced from all other wells, the royalty is to be paid on "the gross proceeds received," "but in no event more than one-eighth (1/8) of the actual amount received by the lessee." *Id.* The same term – gross proceeds – is used in both prongs. In some of the leases within the proposed class, terms other than "gross proceeds" are used and different terms are used in different prongs. While some terms are interchangeable with "gross proceeds," others, such as "proceeds received," may not be. *See e.g.,* Clause 10. Language in the royalty clauses obviously does not have to be identical,

_____

[9]*As the leases are basically illegible, the court has relied on defendant's reproduction of their actual provisions. See Doc. Nos.145-8, 145-9.*

otherwise a class could never be certified. But defendant argues that plaintiffs have included a number of leases in the proposed class which, because of differing language or multiple royalty prongs or attached exhibits, create "what are, in at least some instances, varying or arguably varying royalty obligations." Apache, 285 F.R.D. at 642. *See* Doc. #145, pp. 8-15.

One of the main reason courts have denied class certification motions in similar cases is the existence of a "remarkable variety of royalty provisions." Foster v. Merit Energy Co., 282 F.R.D. 541, 557 (W.D.Okla. 2012); Foster v. Apache Corp., 285 F.R.D. 632, 641-42 (W.D. Okla. 2012).[10] However there are several distinctions between this case and those in which classes were not certified or in which the certification orders were vacated. In several, a majority of the leases simply had not been reviewed. The plaintiff in Apache analyzed, or based her argument on the analysis of, leases involved in fourteen out of 1,200 sample wells. Apache, 285 F.R.D. at 639, 642. The plaintiff in Roderick, in which the Tenth Circuit vacated a class certification order, had not examined 430 out of 650 leases. In Chieftain, 528 Fed.Appx. at 942, 13,568 leases out of 14,300 had not been examined.[11] Here, plaintiffs analyzed all the leases. Other distinctions also exist.

Because it is undisputed that Chaparral sold the gas from the wells and at least

---

[10]The court noted in *Merit*, that "at the heart of plaintiff's class certification argument is the proposition that, for purposes of determining commonality under Rule 23(a) and predominance under Rule 23(b)(3), there is no material difference between the legal ramifications of 'gross,' as used in a royalty clause, and 'net,' as used in a royalty clause." *Merit*, 282 F.R.D. at 559 n.16.

[11]The plaintiff in *Chieftain* also "admit[ted] that some leases expressly abrogate[d] – and one even negate[d] the IDM." Chieftain, 528 Fed. Appx. at 943.

9

nominally sold 85 to 90% of the gas at the <u>well-head</u>,[12] many of the potential issues which defendant asserts to exist as a result of the multiple prongs in the various royalty clauses are eliminated. For example, defendant claims there is a problem with Clause 18 because the royalty depends on whether the gas is sold at the well <u>or elsewhere</u>, with Clause 36, because it has different prices depending on whether gas is <u>used</u> or sold, with Clause 20 because it has different prices depending on whether gas is sold at the well, <u>marketed off the lease</u> or <u>used</u>, and Clause 167 because it has different prices if for casinghead gas <u>used off lease</u> or <u>to manufacture</u> products, if the gas is sold, <u>used off the premises</u>, <u>used to manufacture</u> casinghead gasoline or <u>used</u> as commercial gas. *See id*. at pp. 13-14, ¶9. Another distinction is that Chaparral admitted that the gas from most of the wells goes through a processing plant.[13] *See* Doc. #147-14, p. 7. That distinguishes this case from <u>Roderick</u>, where the defendant argued that "some gas may be marketable at the well, while other gas may require GCDTP services to be made marketable." <u>Roderick</u>, 725 F.3d at 1217.

One final difference is that plaintiffs both argue and have offered evidence that 90% of the class leases "contain exact or similar language" as that previously found by the

---

[12]The defendant in <u>Apache</u> sold "approximately 70% of its gas production downstream at or after it enter[ed] the transmission line and market[ed] the remaining 30% to midstream companies." <u>Apache</u>, 285 F.R.D. at 636.

[13]Defendant asserts that "not all of Chaparral's gas must be processed before entering an interstate pipeline," Doc. #145, p. 24, and that [d]etermining which gas must be processed depends upon the well." Id. The evidence, though, demonstrates that "the overwhelming majority of gas from the class wells goes to a plant." Doc. #147-14, p. 7. Defendant's evidence, at best, demonstrated that gas from "probably more than five" of 2,500 wells went directly from the wellhead to a plant. Id.

Oklahoma Supreme Court or another judge in this district to impose the duty of marketability. *See* Doc. Nos.134, p. 24. n.20; 134-38. Rather than controvert plaintiff's evidence, defendant essentially falls back on its argument that "broad categories of royalty language do not capture *other* relevant lease clauses."[14] Doc. #145, p. 15, ¶13.

Plaintiffs do not discuss or analyze the royalty language considered by the other courts, but instead provide the declaration of an attorney, who states that he "instructed and supervised others to review, compare and categorize the language in the OGLs [oil and gas leases] with royalty clauses previously ruled upon by another federal judge in this District or other Oklahoma courts as not negating the IDM." Doc. #134-37, p. 4, ¶14. Plaintiffs did, though, submit an exhibit, "which shows the Class Leases associated with the various order by another federal judge in this District and other Oklahoma courts." *Id.* at ¶15. The court has confirmed that plaintiffs' exhibit ("Exhibit 29"), is generally accurate at least with respect to the lease language considered by the Oklahoma Supreme Court in <u>Mittelstaedt</u>; <u>TXO Prod. Corp. v. State ex re. Comm'rs of Land Office</u>, 903 P.2d 259 (Okla. 1994), and <u>Wood v. TXO Prod. Corp.</u>,854 P.2d 880 (Okla. 1992) (collectively "<u>Mittelstaedt</u> Clauses"). It did not consider the language reviewed in <u>Naylor Farms, Inc. v. Anadarko OGC</u>, No. 5:08-cv-00668-R (W.D. Okla. 2008) and <u>Hill v. Kaiser-Francis Oil Co.</u>, No. 5:09-cv-000007-R (W.D. Okla. 2009). As for those cases, all plaintiffs provided was the civil case number,

---

[14]*Defendant responded, that "even if Plaintiffs were correct (and they are not) that these terms all mean the same thing, no Oklahoma court has interpreted their meanings when used along with other terms in multi-prong royalty provision." Doc. #145, p. 13, ¶8(b).*

which is insufficient for the court to locate and review the orders pertaining to the royalty clauses.[15]

If the class is limited to royalty owners whose leases include <u>Mittelstaedt</u> Clauses, plaintiffs will have met their burden, "given known variations in lease language," "to affirmatively demonstrate commonality on the implied duty of marketability." <u>Roderick</u>, 725 F.3d at 1218. That is not only because the Oklahoma Supreme Court has concluded the particular royalty clause language does not negate the IDM (or is consistent with the marketable product rule) but because, as discussed earlier, potential issues arising from conflicting language in multiple royalty prongs will not materialize since most of defendant's gas is not only sold, but sold at the wellhead. The court also notes that most of the leases/royalty clauses which defendant specifically challenges as being problematic in its brief, *see* Doc. #145, pp. 8-15, are <u>not</u> among those identified as having <u>Mittelstaedt</u> Clauses and are not therefore included on plaintiff's Exhibit 29.[16] *See* Doc. #134-38.

That still leaves the question of whether, as defendant argues, marketability affects or precludes commonality. Defendant initially contends that plaintiffs' underpayment theory depends on their erroneous assumption that raw gas at the wellhead is not a marketable product. Claiming that plaintiffs' assumption is "wrong" and that "Chaparral has an active

---

[15]*Plaintiffs did not specify in their briefs either the document number or the Westlaw citation, if one existed, for the orders in <u>Naylor Farms</u> or <u>Hill</u> on which they rely.*

[16]*Among the clauses defendant challenges, which do not include language the Oklahoma Supreme Court has concluded does not negate the IDM and which are not listed on Plaintiffs' Exhibit 29 are Clauses 10, 17, 21, 31,35, 42, 55, 59, 64, 69, 70, 71, 75, 76, 80, 81, 83, 107, 124, 127, 162, 165, 169, 194, 195, 198, 199, 200, 201, 202, 203, 205, 230.*

and viable market for its gas at the wellhead,"demonstrates, rather than negates or precludes a finding of commonality. By making the blanket assertion that "[t]he wellhead is a 'market' because several companies compete to buy the gas there . . . so it's marketable right there where it is produced," Doc. #145, p. 17, ¶23, defendant is not contending that an individualized inquiry is needed which would "overwhelm questions common to the class." Chieftain, 528 Fed. Appx. at 943 n 4.

Defendant also asserts that, because not all its gas must be processed before entering an interstate pipeline, a well-by-well analysis will be required, which inquiry would preclude a finding of commonality. However, such an individualized analysis is unnecessary here because, as discussed earlier, defendant acknowledged that the "overwhelming majority of gas from the class wells goes to a plant." Doc. #147-14, p. 7. In addition, the proposed class definition excludes "wells whose gas does not undergo any gathering, compression, dehydration, treatment or processing before entering an interstate pipeline." Doc. #134-40.[17] The court agrees with plaintiffs that the marketability question, as framed by defendant, does not preclude a finding of commonality.

The court concludes that by modifying the class description to leases with "Mittelstaedt Clauses," plaintiffs will have satisfied the commonality requirement for class

---

[17]*Defendant also argues that because half of Chaparral's wells are classified as oil wells while the remaining are gas wells and many of the putative class leases have separate royalty clauses for gas produced from oil wells, an individual analysis would be required to determine "which wells are classified as oil wells, and which leases have different royalty clauses for gas produced from oil wells." Doc. #145, p. 24. The court is not persuaded that that inquiry is of such complexity as would preclude class certification.*

certification.  They have demonstrate[d] commonality on the implied duty of marketability, Roderick, 725 F.3d at 1218.  They also have met commonality's requirement that class members "have suffered the same injury," Wal-Mart, 564 U.S. at 350 (internal quotation marks omitted), – being improperly charged for costs to place the gas in marketable condition.

Typicality and Adequacy

Typicality, along with commonality, serves as a "guidepost[] for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Wal-Mart,564 U.S. at 349 n.5. Both requirements "also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Id.*

Defendant makes several arguments as to why the named plaintiffs' claims are not typical of the class and why the named plaintiffs are not adequate class representatives. Initially it asserts that the "uniqueness of the Named Plaintiffs – and individual putative class members – defeats any possibility of typicality or adequacy," relying in part again on  the "177 *different royalty provisions*."  Doc. #145, p. 28.  For the same reasons that the varying royalty clauses do not destroy commonality, the court concludes they do not destroy typicality or adequacy.

Defendant also asserts that the named plaintiffs' claims are not typical of the class

claims because "[g]as produced from Plaintiff's wells is not the same as gas produced from most of the putative class members' wells." *Id.* at p. 29. While defendant's exact point is unclear,[18] so long as the gas requires some type of service to become marketable, the fact that the gas from some wells requires more services than others does not defeat plaintiffs' showing of typicality. "[L]ike commonality, typicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010). The asserted harmful practice here is defendant's underpayment of royalty based on improper deductions of marketing costs. *See generally* Apache, 285 F.R.D. at 644 (concluding typicality would have been present if commonality had existed, even though class claims were based on different legal theories, because all were "premised on the same allegation of systemic underpayment of royalty" by the defendant). The court concludes the named plaintiffs' claims are typical of the members of the proposed class they seek to represent.

Finally, defendant asserts that the named plaintiffs are not adequate class representatives because they either knew or should have known about their claims. They also, defendant contends, paid royalties to third parties and deducted post-production costs from those payments on wells they operated. Therefore, defendant asserts it will have unique

_____

[18]*Defendant does not develop its argument but cites to its fact statements that (1) plaintiffs own an interest in three of defendant's over 2,500 wells, half of which are oil and half of which are gas wells; (2) some wells produce gas with very high heating value, know as "wellhead" or "rich" gas; and (3) not all of its gas must be processed or compressed before entering an interstate pipeline. Doc. #145, p. 15, ¶¶14-16.*

15

defenses against the named plaintiffs, which will preoccupy the named plaintiffs, precluding them being adequate class representatives.

While defendant may have a specific defense or defenses against the named plaintiffs' claims, particularly those of Naylor Farms, Inc., such is insufficient to demonstrate that the "named plaintiffs and their counsel have any conflicts of interest <u>with other class members</u>" or that they and their counsel would not "prosecute the action vigorously on behalf of the class." <u>Rutter & Wilbanks Corp. v. Shell Oil Co.</u>, 314 F.3d 1180, 1187-88 (10th Cir. 2002) (emphasis added). *See* <u>Apache</u>, 285 F.R.D. at 644-45 (noting, in rejecting a similar argument, that "[e]ven if Apache is ultimately correct that Ms. Foster could not have reasonably relied on the check stubs, she would still have some claims typical of the class's claims (assuming commonality was otherwise satisfied), [a]ll claims would not be time-barred and the resolution of her remaining claims could conceivably resolve issues typical of the class's claims."). Defendant did not otherwise challenge the qualifications of either of the named plaintiffs or their attorneys, who have been involved in similar royalty owners' class actions litigated in Oklahoma. Based on counsels' performance in conjunction with this case, the court is satisfied they will vigorously prosecute the action on behalf of the class[19] and that both they and the named plaintiffs will fairly and adequately protect the class interests.

---

[19]*Although Congress added rule 23(g) in 2003, which specifically governs the appointment of class counsel when the court certifies a class, the Supreme Court noted in* <u>Wal-Mart</u> *that the adequacy of representation requirement of Rule 23(a) "raises concerns about the competency of class counsel . . . ."* <u>Wal-Mart</u>, *564 U.S. at 349 n.5.*

Rule 23(b)

Predominance and Superiority

Because the elements of Rule 23(a) have been met, the court must now determine whether plaintiffs have met their burden under Rule 23(b) – specifically whether they can "show that common question subject to generalized, classwide proof *predominate* over individual questions." CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d 1076, 1087 (10th Cir. 2014). "'The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id*. (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 622-23 (1997)). "Put differently, the predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.* (quoting 2 William B. Rubenstein et al., Newberg on Class Actions § 4:49, at 195–96 (5th ed. 2012)). While the commonality and predominance analyses are necessarily related, the predominance standard is far more demanding. Monreal, 367 F.3d at 1237 (citing Amchem Prods. 521 U.S. at 623–24).

Defendant argues that different lease language, different defenses and different damages defeat predominance. As discussed previously in conjunction with the element of commonality, variations in lease language do not, in this case, present issues which create a lack of predominance. While defendant lists various issues[20] which, it asserts, create a lack

---

[20]*Several of these simply amount to defenses applicable to all (or almost all) plaintiffs' claims, e.g., that a POP contract constitutes a sale which satisfies its royalty obligations.*

of predominance, by limiting the leases to those that include "<u>Mittelstaedt</u> Clauses" the bulk of those will be eliminated.

As for different defenses it may have against individual plaintiffs, defendant again raises issues regarding plaintiffs' prior knowledge about its royalty calculations. It contends what they knew and when they knew it affects the limitations period governing their fiduciary duty claims and their fraud claims. Chaparral also asserts that some leases require the lessor to provide notice of default and allow it an opportunity to cure before taking legal action.

The court in this context is looking for "fatal dissimilarities" between class members which impede the common resolution of the class members' claims. Richard A. Nagareda, <u>Class Certification in the Age of Aggregate Proof</u>, 84 N.Y.U. L.Rev. 97, 132 (April 2009). Neither the limitations defense, insofar as it impacts class members' fiduciary duty claims, nor the notice of default defense, are "more prevalent or important" than the "common, aggregation-enabling issues in the case,"[21] <u>CGC Holding</u>, 773 F.3d at 1087, central to most of the claims, *i.e.* an implied duty to market and its alleged breach. That is not the situation, though, with respect to plaintiffs' fraud claims. As the court concluded in <u>Hill v. Kaiser-Francis Oil Co.</u>, 2010 WL 2474051, at *6 (W.D. Okla. June 9, 2010), the elements of a fraud claim, particularly reliance, present "individual questions, not subject to common proof." *See* <u>Chieftain</u>, 528 Fed. Appx. at 943 n.5. Plaintiffs ignored defendant's challenge to their

_____

[21]*Plaintiffs note that "[a]ssuming that CE's claims are correct, not all of Plaintiff's claims would be time barred." Doc. #150, p. 10.*

fraud claim. In the absence of a showing that reliance in this case is "susceptible to general and classwide proof," <u>CGC Holding</u>, 773 F.3d at 1089, the class can only be certified without the fraud claims.

The other major obstacle to a finding of predominance is "the extent to which material differences in damages determinations will require individualized inquiries." <u>Roderick</u>, 725 F.3d at 1220. Plaintiffs have provided evidence that their expert can determine damages on a class wide basis through use of a model which permits well by well calculations. *See* Doc. #137-25, pp. 12-13. The court concludes at this time that is sufficient to allow a finding of predominance.[22] *See* <u>Hill</u>, 2010 WL 2474051, at *6 (court concluded in certifying class of royalty owners that "liability issues predominate over individualized damage determinations which, in the circumstances of this case, could be accomplished by mathematical computations").

Finally, the court also must consider whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b). The following factors, among others, are considered in making that determination:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the

---

[22]*The court can always, at a later date, determine whether the class needs to be divided into subclasses for purposes of determining damages.*

claims in a particular forum; and

(D) the likely difficulties in managing a class action.

*Id.*

A class action is especially well-suited to vindicate "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." <u>Amchem</u>, 521 U.S. at 617 (internal quotation marks and citation omitted). "'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'" *Id.* (quoting <u>Mace v. Van Ru Credit Corp.</u>, 109 F.3d 338, 344 (7th Cir.1997)). Because the amount an individual royalty owner would recover in this type of lawsuit would be dwarfed by the costs of bringing it,[23] this is precisely the type of action best suited to being filed as a class action. And it is unlikely class members would be interested in controlling the litigation through separate, individual actions.

While the parties have not indicated that the second factor or third factors bear any weight here, the fourth – class manageablity – is contested. Defendant once again relies on the varying royalty clauses to support its position. However, its argument fails for the reasons stated previously when discussing whether the requirements of Rule 23(a) have been met. Subclasses will not be required for each type of royalty clause because of the class restriction to leases with <u>Mittelstaedt</u> Clauses. Contrary to defendant's assertion, subclasses

---

[23]*See Doc. #137-25, p. 12, ¶6.*

also will not be needed to separate wells governed by POP contract from those subject to other sales arrangements or to segregate class members whose payments included post-production deductions from those whose payments did not, because most of the gas sales for the Class Wells are pursuant to POP contracts and defendant admitted that the majority of gas from the class wells required some type of processing. A class action "would achieve [greater] economies of time, effort and expense, and promote [enhanced] uniformity of decisions as to persons similarly situated" than would individual actions. F.R.Civ.P. 23, Advisory Comm. Note (1966). The superiority element of Rule 23(b)(3) is satisfied in this case.

Conclusion

Accordingly, plaintiffs' motion for class certification [Doc. #134], with the stated modifications, is granted. Plaintiffs' fraud claim will be excluded and the class will be limited to include those leases with "Mittelstaedt Clauses" listed on plaintiffs' Exhibit 29.[24]

**IT IS SO ORDERED**.

Dated this 17th day of January, 2017.


_____
JOE HEATON
CHIEF U.S. DISTRICT JUDGE

---

[24]*The class definition also will need to be modified to specify the class period. See supra note 5.*